In re BRINTS COTTON MARKETING, INC., Debtor.

David R. LANGSTON,
Trustee, Plaintiff,

v.

Darrell HUNT, Defendant.

Bankruptcy No. 583–00111.
Adv. No. 585–5059.

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

Dec. 30, 1986.

David R. Langston, McWhorter, Cobb & Johnson, Attorneys at Law, Lubbock, Tex., trustee.

R. Byrn Bass, Jr., Bass & Hobbs, Attorneys at Law, Lubbock, Tex., for Hunt.

## MEMORANDUM OF OPINION

JOHN C. AKARD, Bankruptcy Judge.

Brints Cotton Marketing, Inc. (BCMI) provided a cotton marketing service to farmers. The farmer delivered warehouse receipts for cotton to BCMI and entered into an "on-call" contract with BCMI. The farmer received from BCMI an amount equal to the Commodity Credit Corporation loan value attributable to the cotton, less certain charges for BCMI. The farmer would have a specified length of time in which to "call" his contract. When the contract was called, BCMI would pay the farmer the amount by which the market price for cotton on the date of the call exceeded the Commodity Credit Corporation loan value. *See, Addison v. Langston (In re Brints Cotton Marketing, Inc.)*, 737 F.2d 1338 (5th Cir.1984).

In February, 1982, Darrell Hunt (Hunt) signed on-call contracts with BCMI. The warehouse receipts for Hunt's cotton were not delivered until November, 1982, at which time Hunt received the loan value. In February, 1983, when the contracts had not been called, Hunt and BCMI entered into an agreement allowing him to "roll over" his contracts so he would have another 90 days in which to call them. On or about March 22, 1983, Hunt contacted BCMI and called his contracts. BCMI issued three checks to Hunt dated March 22, 1983, totaling $5,279.29. On March 31, 1983, these checks were paid by the First National Bank, Lubbock, Texas from funds held in the BCMI regular checking account.

On May 24, 1983, BCMI filed for relief under Chapter 7 of the Bankruptcy Code. David R. Langston, the Trustee-in-Bankruptcy for BCMI, filed this proceeding to set aside the $5,279.29 payments to Hunt as preferences under 11 U.S.C. § 547.[1]

### Preferential Transfer?

In order to recover a preferential transfer, the Trustee must establish that the transfer was:

1. To or for the benefit of a creditor;
2. For or on account of an antecedent debt owed by the Debtor before such transfer was made;
3. Made while the Debtor was insolvent;
4. Made within 90 days before the date of the filing of the petition; and
5. Which enables the creditor to receive more than such creditor would receive in a liquidation under Chapter 7.

11 U.S.C. § 547.

Hunt is a creditor of BCMI. The Debtor is presumed to be insolvent during the 90 days immediately preceding the date of the filing of the petition. 11 U.S.C. § 547(f).

1. These transactions occurred prior to the changes made in § 547 by the Bankruptcy Amendments and Federal Judgeship Act of 1984.

Hunt did not dispute that the Debtor was insolvent during that period and there was a specific finding by the prior Judge of this Court that BCMI was insolvent in March, 1983. *Echols v. Langston (In re Brints Cotton Marketing, Inc.)*, No. 583–0147, Bankr.N.D.Tex. March 2, 1984, at 40–42.

The Proofs of Claim filed in this case exceeded $3 million while the liquid assets of BCMI on the date of bankruptcy totaled less than $250,000. When the monies presently in the possession of the Trustee are added to any monies which he might receive in the future (if he is successful in his litigation against other parties), it is probable that the dividend to unsecured creditors will be far less than 100%. *Echols, supra,* at 39–40.

Clearly the transfer occurred within 90 days of the filing of the Bankruptcy Petition.

### When Was the Debt Incurred?

■ The question before the Court is whether the payments to Hunt were "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

The Trustee contends that BCMI incurred the debt when Hunt delivered the warehouse receipts. Hunt contends the debt was not incurred until he called the contract and established the amount due him.

When Hunt delivered the warehouse receipts to BCMI in November, 1982, he fully performed his part of the contract and BCMI obtained title to the cotton. Apparently some of BCMI's financial difficulties arose from the fact that BCMI expected the price of cotton to fall and sold the cotton before the farmers called their contracts. When the price of cotton rose and farmers began calling their contracts, BCMI suddenly found that it had sold cotton for less than it was obligated to pay the farmers. It is the delivery of the goods, in this case cotton represented by warehouse receipts, that established the obligation to pay. TEX.BUS. & COM.CODE ANN. § 2.507 (Vernon 1968).[2]

A "debt" means liability on a claim, 11 U.S.C. § 101(11) and a "claim" means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured," 11 U.S.C. § 101(4)(A). Thus, the debt arose at the time the warehouse receipts were delivered to BCMI and it makes no difference that the debt was unliquidated because the contract had not been called at that time.

In an analogous situation, the prior Judge of this Court held that telephone charges were incurred at the time the call was made, even though the Debtor did not know at that time the amount of the charges and the bill was delivered at a later date. *Bass v. Southwestern Bell Telephone Co. (In re Ray W. Dickey & Sons, Inc.)*, 11 B.R. 146 (Bankr.N.D.Tex.1980). *See also, Sandoz v. Fred Wilson Drilling Co. (In re Emerald Oil Co.)*, 695 F.2d 833 (5th Cir.1983) (holding that the date of delivery determined when the debt arose; not the date the invoice was issued), and *Scherling v. Texaco International Trade, Inc. (In re Transpacific Carriers Corp.)*, 50 B.R. 649 (Bankr.S.D.N.Y.1985) (holding that payment made pursuant to a subsequently honored check was deemed made when the check was delivered).

This case has a fact pattern similar to that of *Dickinson v. Meredith (In re Wathen's Elevators, Inc.)*, 37 B.R. 870 (Bankr. W.D.Ky.1984). Wathen's acted as a merchandiser of grain rather than as a grain storage warehouse. In October and November, 1981, Meredith delivered 3,543 bushels of grain to Wathen's. He received a "scale ticket" indicating the date and amount of delivery, the producer's name and a notation of "deferred settlement" with each delivery. Meredith received no

**2.** The Texas Business and Commerce Code is the Texas adaptation of the Uniform Commercial Code.

warehouse or grain storage receipts. On February 23, 1982, Meredith informed Wathen's that he wanted to "cash in." This demand triggered a final accounting of the grain previously left at the elevator on "deferred settlement." Meredith testified that he did not receive payment upon delivery because he wanted to wait for a better price for his grain and that he couldn't settle until January 1, 1983 for tax reasons. *Id.* at 874 n. 19. The Court found that the payment to Meredith was a preference and stated:

> Prior to delivery, Wathen's could never have to issue a settlement check—there being nothing to settle. All dates subsequent to delivery are identical for *on any given day* Meredith could have activated the payment process by making demand. Simply put, without delivery there is no obligation to pay, and at any time after delivery, at seller's choice, the elevator must pay. For preference purposes, then, the debt is "incurred" at delivery.

*Id.* at 872.

Hunt argues that he did not incur the debt until he became legally bound to pay, citing *Barash v. Household Finance Corp.*, 658 F.2d 504 (7th Cir.1981). In *Barash*, the Court held that the debt in question became due at the time the note was signed and that payments made on unsecured obligations within 90 days of the filing of the Bankruptcy Petition constituted preferences. This decision supports this Court's conclusion that the debt became due upon delivery of the warehouse receipts.

Hunt cited *Nolden v. Van Dyke Seed Co. (In re Gold Coast Seed Co.)*, 751 F.2d 1118 (9th Cir.1985). In that case, the Debtor signed contracts in September and November, 1979 to purchase seed from the Van Dyke Seed Company at specified prices. The seed was shipped to the Debtor in February, 1980 and he paid for it in April, 1980, within 45 days of the time shipment began. The Court held that this was a

payment of a debt incurred in the ordinary course of business and not later than 45 days after the debt was incurred. The Court concluded that the debt arose when the seed was delivered; precisely the same conclusion reached by this Court in this case.

Hunt also cited *Iowa Premium Service Co. v. First National Bank in St. Louis (In re Iowa Premium Service Co.)*, 695 F.2d 1109 (8th Cir.1982) and *Ford Motor Credit Co. v. Ken Gardner Ford Sales, Inc. (In re Ken Gardner Ford Sales, Inc.)*, 10 B.R. 632 (Bankr.E.D.Tenn.1981) at 646. These cases deal with the accrual of interest and hold that interest is not due until accrued. In the instant case, the BCMI debt became due upon the delivery of the warehouse receipts, even though the exact purchase price remained to be determined.

### *Ordinary Course of Business?*

■ Hunt further asserted that payment was made within 45 days after the debt was incurred in the ordinary course of the business of both parties and was made according to ordinary business terms; thus exempting it from the preference requirements of 11 U.S.C. § 547(c)(2). He contended that the "rollover" of the contract in February, 1983 created a new obligation. This is certainly not the case, however, since the obligation was created when the warehouse receipts were delivered. BCMI simply granted an extension of the time for Hunt to call the contract. Hunt did not show that any new consideration was paid to BCMI for this extension—although the payment of consideration would not change the result.

For the reasons stated herein, the Court holds that the $5,279.29 paid by BCMI to Hunt on March 31, 1983, constituted preferences which may be recovered by the Trustee-in-Bankruptcy.

Order accordingly.[3]

---

**3.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to

Bankruptcy Rule 7052.