John DELL'ORFANO, Plaintiff,

v.

Charles SCULLY, et al., Defendants.

No. 83 Civ. 1418 (PKL).

United States District Court,
S.D. New York.

July 29, 1988.

Nourse & Bowles, New York City, for plaintiff; William Xanttopoulous, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendants; Eugene Murphy, Ronald Turbin, Asst. Attys. Gen., of counsel.

## OPINION & ORDER

LEISURE, District Judge:

Plaintiff John Dell'Orfano ("Dell'Orfano"), an inmate at Green Haven Correctional Facility ("Green Haven") brings this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that his civil rights were violated because proceedings that resulted in his placement in "Involuntary Protective Custody" ("IPC") in a Special Housing Unit ("SHU") at Green Haven did not accord him procedural due process. In addition, in his amended complaint, plaintiff charges that his civil rights were violated by the deliberate introduction of false testimony at his disciplinary hearing, and by the failure of certain prison officials to act in accordance with state law. Finally, plaintiff alleges that his civil rights were violated when prison officials refused to release him from IPC even though the proceedings against him had been "reversed" on administrative appeal. Plaintiff also asserts causes of action based on state law, over which he asks the Court to exercise pendent jurisdiction.

## FACTUAL BACKROUND

On August 11, 1981, Dell'Orfano was physically examined by defendant Nurse Peggy Pendleton ("Nurse Pendleton") and a physician's assistant, Fred Deutsch ("Deutsch"), for evidence of drug use. Plaintiff's suspected drug use was allegedly based upon confidential information received by Sergeant Armand Bouffard ("Sgt. Bouffard"). As a result of this examination, needle marks were found along the veins of plaintiff's arm. Based on this finding, Pendleton and Deutsch concluded that plaintiff had recently injected himself with narcotic drugs. Despite plaintiff's request, no blood test was administered during the course of the examination.

After examination by Nurse Pendleton and inspection of plaintiff and his cell, Dell'Orfano was returned to his cell and placed under "keeplock" status, *i.e.*, confined to his cell. On that same day, Dell'Orfano was given a Notice of Report advising him that a corrections officer had filed a misbehavior report on plaintiff with Green Haven Superintendent Charles Scully ("Scully"). This form did not state what rule the prisoner had violated; it only noted that the matter was under investigation.

On August 12 and 13, 1981, plaintiff appeared before an Institution Adjustment Committee. During this hearing, Lieutenant Ernest Edwards ("Lt. Edwards") asked Dell'Orfano for information regarding the use of drugs and drug trafficking in E-Block, the unit to which plaintiff was assigned. According to plaintiff, he was told that if he did not cooperate, he would be moved to the disciplinary block and suffer a loss of privileges. In response, plaintiff contended that he had no such information concerning drug activities. At this hearing, plaintiff asked Edwards what the charges were against him. Plaintiff was told that he had not yet been formally charged, but that he would remain confined pending investigation.

On August 17, Lt. Edwards ordered plaintiff placed in IPC under confinement for 23 hours a day. The following day, Dell'Orfano was given a "notice of charge" that formal charges had been filed against him which would be the subject of a Superintendent's proceeding to be held that week. This formal charge reads as follows:

> You are hereby advised that no statement made by you in response to the information derived therefrom may be used against you in a criminal proceeding.

INVOLUNTARY PROTECTION

On August 11, 1981 at approximately 2:00 p.m., per orders of Sgt. Bouffard, you were escorted to the facility hospitial to be checked for possible needle marks on your arms. This check was ordered based on suspicion that you were using narcotics.

As a result of the examination by P. Pendleton, R.N., (4) four needle marks were discovered on your right arm.

Based on the above, the administration has recommended that for your health and safety, you be placed in Involuntary Protection Status.

NOTE: The inmate shall be permitted to call witnesses on his behalf provided that so doing does not jeopardize institutional safety or correctional goals.

Superintendent's Proceeding Formal Charge, annexed as Exhibit 1 to Affidavit of Eugene Murphy, Esq., sworn to on November 27, 1984 (hereinafter "Murphy Aff."), at 3.

Although plaintiff acknowledges receipt of this notice of charge, he alleges that he was never informed—and was not aware until discovery ensued in this lawsuit—that he was specifically suspected of using narcotics on the evening of August 10, 1981, or that a corrections officer, namely Sgt. Bouffard, stated that he had received confidential information regarding Dell'Orfano's drug use. Defendants do not deny the omission of the details as alleged by plaintiff, but they maintain that such specificity is not material to the issues involved in this lawsuit.

On August 19, 20 and 21, plaintiff appeared at an involuntary protection hearing conducted by defendant Captain Richard H. Penny ("Captain Penny"). At the outset of the hearing, plaintiff was asked if he wanted to call witnesses on his behalf or whether he wanted statements from anyone. Dell'Orfano declined to present any witnesses or any testimony on his behalf. Plaintiff has since stated that he had "no idea who to call as a witness" at the hearing because he "did not know what [he] was trying to prove." Affidavit of John Dell'Orfano, sworn to on October 1, 1985, at ¶ 15 (hereinafter "Dell'Orfano Aff."), annexed to Plaintiff's Notice of Cross Motion. According to plaintiff, he thought he was being punished for his prior unwillingness to inform prison officials about drug use by other inmates at Green Haven. *Id.* At the beginning of the Superintendent's proceeding, however, Captain Penny made the following statement:

You are before this Superintendent's Proceeding because you where [sic] placed in involuntary protection and you must appear before the Superintendent's Proceeding for that certian protection. On August 11, 1981 at approximately 2 o'clock p.m. by orders of Sergeant Bouffard you were escorted to the facility hospital to check for possible needle marks on your arms. This check was ordered based on suspicion that you were using narcotics. As a result of the examination by P. Pendleton R.N. four needle marks were discovered on your left arm. Based on the above the administration has recommended that for your health and safety you be placed in involuntary protective status. The inmate shall be permitted to call witnesses on his behalf provided that in doing so does not jeopardize institutional safety or correctional goals.

Transcript of Superintendent's Proceeding, annexed as Exhibit F to Plaintiff's Notice of Cross Motion (hereinafter "Sup't Prcdg." at 2–3.

At the hearing, plaintiff specifically told Captain Penny that he did not feel his IPC status was justified. In addition, Dell'Orfano expressly denied that he had been using drugs before his August 11th examination and denied the existence of any needle marks on his arms. As to the latter denial, plaintiff has consistently maintained that any bruises or abrasions found on his body at the time he was examined by Nurse Pendleton were due solely to his having played football on a hard surface at Green Haven. *See* Dell'Orfano Aff. ¶¶ 5–6.

On August 20, Captain Penny interviewed Nurse Pendleton who confirmed that she had observed needle marks on plaintiff's arm during the August 11th ex-

amination. Plaintiff Dell'Orfano was not present during this interview. On August 21, Sgt. Bouffard testified, *inter alia,* that on August 11th he had received confidential information from a reliable informant that on the night of August 10, Dell'Orfano was observed shooting up with a syringe containing heroin. Once again, Dell'Orfano was not present during this interview concerning the existence of confidential information. On August 21, at the close of the Superintendent's proceeding, plaintiff was informed that Pendleton and Bouffard had provided testimony, although plaintiff was not advised as to the substance of Bouffard's testimony. At the conclusion of this hearing, Captain Penny informed plaintiff that he would remain in protective custody for his own safety. At the same time, however, plaintiff was also told that he was not being charged with any violation, and that he would be placed on the transfer list. Sup't Prcdg. at 18.

According to the deposition testimony of Deputy Superintendent Dean Riley ("Riley"), inmates are sometimes placed in IPC for breaking a rule when officials do not have enough proof to warrant pressing formal charges. Transcript of deposition of Dean R. Riley, annexed as Exhibit G to Plaintiff's Notice of Cross Motion, at 22. Captain Penny specifically testified in deposition that the evidence of plaintiff's drug use—unconfirmed testimony by a confidential informant, and the observations of registered nurse Pendleton of needle marks—was not, in the absence of a blood test, "conclusive" enough to warrant charging plaintiff with drug use. Transcript of deposition of Richard H. Penny (hereinafter "Penny Dep."), annexed as Exhibit H to Plaintiff's Notice of Cross Motion. Dell'Orfano remained in IPC until November of 1981.

On November 16, 1981, the disposition of Dell'Orfano's IPC hearing was reversed by the Departmental Review Board Of the New York State Department of Correctional Services on grounds of "procedural error." The meaning of "procedural error" was not explained by the Review Board in its reversal. Plaintiff alleges that on or about November 21, 1981 defendants

Henderson, Sanford, Molota and Ramirez once again locked plaintiff in his cell in the IPC unit despite the fact that plaintiff held a valid document overturning the Superintendent's order that he be confined to that unit. Plaintiff further alleges that he was not released from the IPC unit until he was further disciplined for his demand to be released. Dell'Orfano contends that defendants Riley, Scully and Edwards had a duty to ensure proper release of the plaintiff. The parties are in dispute as to the precise date on which plaintiff was released from IPC, but it is clear that plaintiff was not released immediately upon prison officials' receipt of the reversal.

Plaintiff filed this action on February 23, 1983. On November 16, 1984, plaintiff's appointed counsel moved, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend the complaint that Dell'Orfano had originally filed *pro se.* The amended complaint set forth in greater detail the alleged violations of plaintiff's civil rights, and joined six defendants who Dell'Orfano alleged were partially responsible for his unlawful confinement. By a stipulation, so ordered by the Court on December 4, 1984, leave to amend the complaint was granted.

Defendants moved to dismiss the complaint under Rules 12(b)(6) and 12(c). By Order dated May 22, 1985, the Court notified all parties that defendants' motion to dismiss would be treated as one for summary judgment because matters outside the pleadings were submitted to the Court. On October 3, 1985, plaintiff cross moved for summary judgment with respect to certain counts in the amended complaint. By order dated October 20, 1986, the Court requested both parties to submit supplementary memoranda of law specifically addressing particularized legal issues within the context of a motion for summary judgment. Thereafter, supplementary papers addressing these issues were filed by both parties.

The Court now considers the cross motions for summary judgment. For the reasons set forth below, defendants' motion is granted, and plaintiff's cross motion is denied.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985)); *see Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir.1988).

The Court must first look to the substantive law governing the case to determine which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. Once the Court has determined what facts are material, it must then determine whether there is a genuine issue as to a material fact. At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. The standard for summary judgment thus "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250, 106 S.Ct. at 2511.

The party seeking summary judgment always bears the initial burden of informing the court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden on the moving party will be "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. The burden then shifts to the nonmoving party to show that there is a genuine issue of fact for trial. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. When, as in this case, both sides move for summary judgment, the Court must apply the same standard to both motions. *Eastman Machine Co. v. United States*, 841 F.2d 469, 473 (2d Cir.1988).

Before reaching the merits of plaintiff's claims, however, the Court must address the threshold question of the timeliness of the causes of action asserted. The Supreme Court has held that section 1983 claims are best characterized as personal injury actions and that the relevant statute of limitations for personal injury actions should therefore apply. *Wilson v. Garcia*, 471 U.S. 261, 278, 105 S.Ct. 1938, 1948, 85 L.Ed.2d 254 (1985). Accordingly, pursuant to CPLR section 214(5), a three year statute of limitations governs this section 1983 action. *Okure v. Owens*, 816 F.2d 45, 49 (2d Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988). Plaintiff commenced this action within the applicable time period, but later amended his complaint to assert new causes of action and to bring in new parties. Defendants contend that several claims are time-barred because they were first asserted in the Amended Complaint.[1] Defendants contend that those new claims, some of which

---

1. Plaintiff moved for leave of Court to amend the Complaint on November 16, 1984. On December 4, 1984, the Court so ordered a Stipulation and Order allowing an Amended Complaint to be served and filed. A search of the docket sheet and the Court file reveals that no Amended Complaint was ever officially filed. Because the Court and opposing counsel received the proposed Amended Complaint annexed to the Notice of Motion to Amend the Complaint and to the Stipulation and Order allowing the serving and filing of the Amended Complaint, the Court deems the Amended Complaint filed as of December 4, 1984. All references to the Amended Complaint throughout this opinion refer to that proposed Amended Complaint.

are asserted against defendants not parties to the original complaint are not timely. Plaintiff asserts that the new claims "relate back" to the filing of the original complaint, and are therefore within the applicable limitations period.

Rule 15(c) of the Federal Rules of Civil Procedure provides in pertinent part:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action that party to be brought in by amendment that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c).

■ The Court finds that the claims asserted in the Amended Complaint arise from the same conduct, transaction or occurrence attempted to be set forth in the original Complaint. The Court also finds that plaintiff's claims against newly added defendants are timely as well. Judge Nickerson's opinion in *Davis v. Krauss*, 93 F.R. D. 580 (E.D.N.Y.1982), is instructive in this regard:

> Where a public body is required by law to indemnify an employee, the New York state courts deem it, though not named, the "real party in interest" in determining the requirements of notice and the statute of limitations.

*Id.* at 582. *See also Dupree v. Walters*, 116 F.R.D. 31, 34 (S.D.N.Y.1987) ("Courts have uniformly held that knowledge of a lawsuit can be imputed to a new defendant state official through his attorney, when the attorney also represented the officials originally sued."); *Morrison v. Lefevre*,

592 F.Supp. 1052, 1057 (S.D.N.Y.1984). Accordingly, the Court finds that plaintiff's claims are not time-barred, and proceeds to the merits of the claims.

In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court considered the general issue now before this Court: whether the Due Process Clause of the Fourteenth Amendment in any way limits the authority of prison administrators to remove inmates from the general prison population and place them in less desirable confinement. In *Hewitt*, an inmate was placed in restrictive confinement pending a state criminal investigation into his role in a prison riot. He was placed there pursuant to a prison administrator's finding that he was "a danger to staff and to other inmates if released back into the general prison population." *Id.* at 465, 103 S.Ct. at 868. As the Court noted at the outset, "[l]iberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt*, 459 U.S. at 466, 103 S.Ct. at 868; *Meachum v. Fano*, 427 U.S. 215, 223–27, 96 S.Ct. 2532, 2538–40, 49 L.Ed.2d 451 (1976). In light of the obvious need for prison officials to exercise broad discretionary authority over the institutions they manage, the Supreme Court has held that "lawfully incarcerated persons retain only a narrow range of protected liberty interests." *Hewitt*, 459 U.S. at 467, 103 S.Ct. at 869. *See Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 2980, 41 L.Ed.2d 935 (1974); *Meachum v. Fano*, 427 U.S. at 225, 96 S.Ct. at 2538. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

Therefore, the Court has held that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by pris-

on authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *see Vitek v. Jones*, 445 U.S. 480, 493, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980); *Sher v. Coughlin*, 739 F.2d 77, 80 (2d Cir.1984). "It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt*, 459 U.S. at 468, 103 S.Ct. at 869.

In the instant case, plaintiff argues that he was placed in IPC for punitive rather than administrative reasons, and that this confinement constituted a violation of his due process rights. Defendants contend, however, that plaintiff was placed under involuntary protection status pending transfer to another facility and in order to protect plaintiff's health and safety and to prevent him from obtaining narcotic drugs. As Deputy Superintendent Riley reasoned: "Involuntary protective status would protect plaintiff from recieving further narcotics and would eliminate the possibility of conflict developing between the plaintiff and his source of supply...." Affidavit of Dean Riley, sworn to on November 20, 1986, annexed as Exhibit B to Turbin Aff., ¶ 3.

The imposition of administrative segregation in the case at bar is similar to the type of administrative segregation described by the Court in *Hewitt*: "[t]he phrase 'administrative segregation' as used by state authorities here appears to be something of a catchall; it may be used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates or simply to await later classification or transfer." *Hewitt*, 459 U.S. at 468, 103 S.Ct. at 869–70.

▄▄▄ Inasmuch as the Due Process Clause of the Fourteenth Amendment does not create a liberty interest in remaining among the general prison population, plaintiff must identify a liberty interest created by the laws or regulations of New York State. The Court notes at the outset that the mere failure of a state employee to conform to state law is not by itself actionable under § 1983; but unconstitutional conduct that also violates state law is actionable. *Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

▄▄▄ The Second Circuit made clear in *Sher v. Coughlin*, 739 F.2d 77 (2d Cir. 1984), that, ordinarily, when restrictive confinement within a prison is expressly imposed as a disciplinary sanction, a liberty interest created by state law is impaired. *Id.* at 81. However, a protected liberty interest is also created when state statutes or regulations place a "substantive limitation on the discretion of prison officials to place an inmate in such a unit for 'nonpunitive reasons.' " *Id.* *See McCann v. Coughlin*, 698 F.2d 112 (2d Cir.1983).

> The Court in *Sher* went on to note that the existence of a liberty interest grounded in state law is less easy to identify when, as in Sher's case, the prison officials purport to impose restrictive confinement for administrative reasons and the inmate alleges that their true motivation is punishment.

*Sher*, 739 F.2d at 81. The Court noted that this problem is further complicated by the fact that the conditions of confinement to which Sher was assigned were substantially as rigorous as those in disciplinary confinement. That is so in this case as well.

In a case of dual motivation the *Sher* Court found:

> "the appropriate analysis derives from the Supreme Court's decisions in both *Hewitt v. Helms, supra,* and *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Following *Helms*, we first inquire whether New York statutes or regulations have placed substantive limitations on the discretion of prison officials...."

*Sher*, 739 F.2d at 81.

▄▄▄ The Court concludes that the regulations at issue here place such substantive limitations on the discretion of prison officials in placing an individual in SHU for

protective confinement and that a liberty interest is therefore created under state law. According to 7 N.Y.C.R.R. § 304.1(b), an inmate may be placed in SHU if he "must for good cause be restricted from communication with the general inmate population." An inmate may be placed in such a unit, however, only in accordance with sections 302.3 and 304.4. Section 304.3 provides that an inmate shall be placed in SHU only where there is "substantial evidence that such action is necessary." The regulation further provides:

> Where the inmate does not consent to a protective admission to a special housing unit ... a proceeding will be held within 14 days of the date of such admission or such request for reassignment to determine if there is substantial evidence that protective custody is necessary.

7 N.Y.C.R.R. § 304.3.

█ The state regulation's requirement that a proceeding be held in regard to all non-punitive protective confinements gives rise to a protected liberty interest. As Honorable John E. Sprizzo, District Judge of this Court, explained in *Hilliard v. Scully,* 537 F.Supp. 1084 (S.D.N.Y.1982),

> the state itself has acknowledged that liberty interests are at stake with respect to the proceeding at issue. Indeed, [by enacting § 304.3] it has limited the discretion of its prison officials with respect to the commitment of inmates to involuntary protective custody in special housing units by requiring that, within 14 days of such admission, a proceeding with procedural safeguards must be conducted to determine whether there is substantial evidence that protective custody is necessary. (Citations omitted). Having conditioned such confinement on a finding that protective custody is necessary, the state cannot now properly claim that no liberty interest is at stake.

537 F.Supp. at 1087. *See Matiyn v. Henderson,* 841 F.2d 31, 35–36 (2d Cir. 1988), *cert. denied,* —— U.S. ——, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988). Indeed, in the instant case, defendants specifically concede that a protected liberty interest is created by section 304.3. Defendants' Memo at 20.

The second question the Court must face in a case of dual motivation is

> whether the liberty interest that would have been implicated had Sher been placed in restrictive confinement as punishment arises in the circumstances of this case. Since the due process issue was decided on motion for summary judgment and no finding was made that a punitive purpose played no part in the confinement decision, the issue becomes one of dual motivation.... *Mt. Healthy* teaches that state action taken on the basis of both valid and invalid motivations is not constitutionally tainted by the invalid motive if the action would in any event have been taken on the constitutionally valid basis.

*Sher,* 739 F.2d at 81–82. In the instant case, prison officials had the valid goal of protecting Dell'Orfano from receiving drugs. Captain Penny stated that he "certainly wouldn't want to put him or any other inmate back into the same environment to have access to this kind of thing again." Penny Dep. at 34. It follows that Dell'Orfano's confinement was for valid administrative reasons. *See Hall v. Unknown Named Agents of New York State Department for Correctional Services for APPU Unit at Clinton Prison,* 825 F.2d 642, 647 (2d Cir.1987). Under the rationale of *Sher,* if prison officials provided the process to which Dell'Orfano was due, he has no claim cognizable under section 1983.

Having determined that state law created a liberty interest in remaining in the general prison population, the next question before the Court is to identify the process to which plaintiff was entitled and to evaluate whether those due process rights were violated.

In general, due process requires an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); *Giglio v. Dunn,* 732 F.2d 1133, 1135 (2d Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 328, 83 L.Ed.2d 265 (1984). "The level of procedur-

al safeguards that must be afforded before the government may deprive an individual of a protected interest is determined by reference to (1) the private interest at stake, (2) the risk of error inherent in the use of one form of procedure over another, and (3) the interest of the government." *Patterson v. Coughlin, supra,* 761 F.2d at 890. *See also Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

In *Hewitt v. Helms, supra,* the Court held that administrative segregation of a prison inmate—where the inmate posed a threat to the safety of other inmates and prison employees and where an investigation into the charges against the inmate was continuing—required only an "informal, nonadversary review of the information supporting [the prisoner's] administrative confinement, including whatever statement [the prisoner] wished to submit, within a reasonable time after confining him to administrative segregation." 459 U.S. at 472, 103 S.Ct. at 872.

In light of these guidelines and New York's statutory law governing administrative segregations, the Court now turns to the precise facts of this case to decide whether, taken as a whole, the circumstances surrounding plaintiff's confinement violated plaintiff's due process rights.

### ALLEGED DUE PROCESS VIOLATIONS

A. *Failure to provide a Formal Charge.*

Plaintiff's first cause of action alleges that he was not notified of the charges against him in violation of 7 N.Y.C.R.R. § 253.2 and § 304.3. These regulations require that an inmate be provided with a formal charge consisting of "written specification of the particulars of the incident of behavior involved and the date, time and place of such incident." 7 N.Y.C.R.R. § 253.2. Such a formal charge is to be served upon an inmate at least 24 hours before a section 304.3 hearing in order to provide the inmate with adequate opportunity to respond to the charges at the hearing. 7 N.Y.C.R.R. § 253.3(b). The Institu-

tion Adjustment Committee hearing on August 12 and 13 was not a section 304.3 hearing. The first and only section 304.3 hearing for plaintiff was the Superintendent's proceeding that commenced on August 19.

■ The charge recites the pertinent facts giving rise to plaintiff's admission to SHU, namely, Nurse Pendleton's examination of plaintiff's arm on August 11th. Defendants' Memo, Exhibit 1, at 4. Defendants have also provided evidence that plaintiff acknowledged receipt of the Formal Charge. Exhibit 2, at 1. Moreover, plaintiff's own statement pursuant to Rule 3(g) states that "John Dell'Orfano was given a notice of charge on August 18, 1981 in the form attached as Exhibit D." Plaintiff's Civil Rule 3(g) Statement ¶ 12. The Court finds that this formal charge was sufficient to apprise plaintiff of the basis for his confinement in SHU inasmuch as it recited the facts of the examination by Nurse Pendleton, and was provided to plaintiff 24 hours in advance of his Superintnendent's hearing as required by section 253.3(b). Affidavit of Richard H. Penny, sworn to on November 24, 1986, ¶ 4, annexed as Exhibit A to Affidavit of Ronald Turbin, Esq., sworn to on November 28, 1986. Accordingly, plaintiff's first claim is without merit.

B. *Use of False Testimony.*

■ Plaintiff's second cause of action is based on allegedly false statements at the Superintendent's hearing by Sgt. Bouffard and Nurse Pendleton. At the Superintendent's hearing on August 21, 1981, a report was submitted by Sergeant Bouffard asserting the existence of confidential information to the effect that plaintiff had been injecting heroin the evening before he was placed in SHU. At no time did Captain Penny, who conducted the proceedings, or anyone else, inform plaintiff of the substance of Sgt. Bouffard's allegations. During the course of his deposition on July 17, 1984, Sgt. Bouffard disclosed for the first time that there had been no confidential informant providing this information directly to him. Transcript of deposition of Ar-

mand Bouffard at 30–40, annexed a Exhibit J to Plaintiff's Notice of Cross Motion. Rather, he stated that he had received the information from Corrections Officer Stevens. Officer Stevens stated, however, that all information he received was from Sgt. Bouffard. Transcript of deposition of Barton Stevens, at 27–28, 36, annexed as Exhibit K to Plaintiff's Notice of Cross Motion. Plaintiff therefore claims that false evidence was adduced at his IPC hearing.

Plaintiff also alleges that a false report was given by Nurse Pendleton who testified that she had examined plaintiff's arm by use of a tourniquet when in fact she had not used such a device. This allegation has not been substantiated. Indeed, Dell'Orfano stated at the Superintendent's proceeding that Deutsch "put a tourniquet on my arm, he asked me I said 'yeah, go ahead.'" Sup't Prcdg. at 4. Plaintiff contends that the false statements made by Sgt. Bouffard, the allegedly false report filed by Nurse Pendleton, and Captain Penny's failure to scrutinize such evidence constitute a violation of his due process rights.

For the purposes of this motion, the Court will assume that the testimony given and reports filed were false. The due process protection against the use of false testimony to confine an individual has been applied to prison proceedings. In *Morrison v. Lefevre, supra,* 592 F.Supp. 1052, the Court held that officers who planted a vial of contraband and then reported the evidence to prison officials were liable under section 1983 for depriving an inmate of his due process rights:

> Morrison has established that he was denied due process because his confinement was based on findings or suspicions created by false reports made by prison officials. However minimal may be the process due to prisoners before segregation, that process is insufficient when it has been contaminated by the introduction through State action of false evidence [which] in itself violates the due process clause.... The fact that prisoners are not entitled to the full panoply of procedural protections afforded at trial when they are subject to internal prison

discipline does not deprive them of the fundamental right not to have state officials make purposefully false statements about them.

*Id.* at 1073.

Plaintiff urges that *Morrison* controls the instant case. But in *Freeman v. Rideout,* 808 F.2d 949 (2d Cir.1986), *reh'g in banc denied,* 826 F.2d 194 (2d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988), the Second Circuit held:

> There appears to be a confusion between the existence of a constitutionally protected right, and the deprivation of that right without procedural safeguards or due process. The constitutionally protected interest in this case is the right of liberty. The fourteenth amendment does not prohibit every deprivation of liberty. It does, however, prohibit the deprivation of liberty without due process of law.
>
> The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. The plaintiff, as all other prison inmates, has the right not to be deprived of a protected liberty interest without due process of law. As is shown by the facts of this case, before Freeman could be placed in segregation, due process required that he be granted a hearing on whatever charges had been made against him.

*Freeman, supra,* 808 F.2d at 951. The Second Circuit distinguished *Morrison* on its facts because in *Morrison* Judge Sofaer found that the prisoner was never afforded a hearing of any kind.

The question remains, however, whether the false statements in question constituted the basis for denying plaintiff his liberty to remain in the general prison population as they did in *Morrison* or whether independent evidence existed to satisfy the requirement of section 304.3(c) that "substantial evidence" be presented that "protective custody is necessary." In *Freeman,* the Second Circuit held that "[o]nce a court has decided that the procedural due process

requirements have been met, its function is to determine whether there is some evidence which supports the decision of the prison disciplinary board." 808 F.2d at 954. The Court concludes that such substantial evidence existed in the testimony of Nurse Pendleton who observed, with or without the use of a tourniquet, needle marks on plaintiff's arm indicating the intravenous use of drugs. The Superintendent's Proceeding held in accordance with state regulations, provided plaintiff with an opportunity to confront and respond to the major evidence that formed the basis of Captain Penny's decision to retain him in administrative segregation. The Court is convinced that absent Sgt. Bouffard's false testimony, substantial evidence existed to justify Captain Penny's decision to continue plaintiff's IPC status.

The Second Circuit's recent decision in *Franco v. Kelly*, 854 F.2d 584 (2d Cir.1988), does not change this result. In that case, the Court held that access to the courts and the right to petition are entitled to substantive and not merely procedural protection. *Id.* at 589. Neither the right to petition nor the right of access to the courts is involved in this case; plaintiff's claims are based solely on the lack of procedural due process. Accordingly, *Freeman* is controlling on this issue, and because plaintiff suffered no denial of liberty due solely to Nurse Pendleton's or Sgt. Bouffard's allegedly false reports, no action under section 1983 is available to the plaintiff on this basis.

### C. *Failure to Inform Plaintiff of the Substance of Sgt. Bouffard's Testimony.*

■ Plaintiff's third cause of action asserts that he was denied due process of law because he was not informed of the substance of Sgt. Bouffard's testimony. But as the Supreme Court held in *Hewitt,*

an informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation.

459 U.S. at 476, 103 S.Ct. at 874. In the instant case, Dell'Orfano was informed that the reason for the hearing was that he was suspected of drug use. *See* Notice of Charge, annexed as Exhibit D to Plaintiff's Notice of Cross Motion. He was afforded several opportunities by Captain Penny to present his views on whether he should be kept in IPC. Accordingly, plaintiff's third claim is without merit.

### D. *Placement of Plaintiff in Keeplock Status.*

■ Plaintiff's fourth cause of action asserts that the Adjustment Committee's action concerning plaintiff was contrary to Part 252 of the N.Y.C.R.R. and did not serve any valid purpose. Amended Complaint ¶ 40. Plaintiff further alleges that the use of the Adjustment Committee to threaten plaintiff and place him in keeplock was a violation of his due process rights. Amended Complaint ¶ 42.

Section 252.3(f) specifically provides:

Where an inmate is being held in confinement in his cell or room or in a special housing unit, the committee shall interview the inmate at its first meeting following the date of confinement. If the committee is not prepared to make a disposition at that time, the committee shall decide at that time whether the inmate is to be released from such confinement or is to remain in confinement pending disposition of the matter by a superintendent's proceeding.

7 N.Y.C.R.R. § 252.3(f). It is therefore irrelevant that Lt. Edwards may have threatened to keep plaintiff in keeplock, as that was one of the options available to the Adjustment Committee.

Plaintiff objects throughout his papers that he was not found guilty of a specific rule or regulation violation. But section 252.5(b) expressly provides:

The action taken by the committee shall be based upon its evaluation of the in-

mate's attitude and his overall adjustment to the order and programs that must be maintained in the facility, as well as upon the committee's evaluation of the facts and circumstances of the particular incident described in the report or slip. The committee shall not be required to make a finding as to whether an inmate violated any particular rule or regulation and shall not direct the action it takes toward the objective of imposing punishment for a violation.

7 N.Y.C.R.R. § 252.5(b).

In *Bolden v. Alston*, 810 F.2d 353 (2d Cir.1987), the Second Circuit noted:

Appellants do not contest that Bolden had a liberty interest in remaining in the general prison population. But they argue that Bolden, like Helms, was confined pending disposition of a misconduct charge, his confinement following the Adjustment Committee Proceeding need satisfy only the lesser due process standard set out in *Helms*. We agree. Whether Bolden was ordered into confinement in the SHU by Kirkland or by Alston, that confinement was an administrative measure taken pending the convening of a Superintendent's Proceeding. No violation was adjudicated by the Adjustment Committee Proceeding, and no disciplinary sanction was imposed. Like Helms, Bolden was administratively separated from the general prison population pending a disciplinary hearing. Since Bolden had been informed of the charges and was given an opportunity to respond, he received the minimal due process rights required for this type of administrative confinement.

*Id.* at 357–58. Accordingly, plaintiff's claim that he was denied due process in his Adjustment Committee hearing and placement in keeplock does not constitute a claim cognizable under section 1983.

E. *Failure to Release Plaintiff to the General Prison Population Following the Reversal of the Superintendent's Proceeding.*

On November 16, 1981, the Special Housing Director of the Department of Corrections, Charles P. Hernandez ("Hernandez"), ordered a reversal of plaintiff's Superintendent's Proceeding on August 21, 1981. The form signed by Hernandez states that the reversal was due to "procedural error." Plaintiff's Memo, Exhibit B. At his deposition, Hernandez stated that he viewed the Superintendent's Proceeding as a disciplinary hearing because "the notice that he was given did not state it was a protective custody hearing, and the officer's misbehavior report did not state it was a protective custody hearing." Transcript of deposition of Charles P. Hernandez, annexed as Exhibit Q to Plaintiff's Notice of Cross Motion.

On November 21, 1981, defendants Henderson, Sanford, Molata and Ramirez refused to release plaintiff from his cell in SHU even though plaintiff held a document overturning the Superintendent's proceeding. Plaintiff was not immediately released from the unit. Plaintiff asserts that the prison officials' failure to release him constituted a due process violation.

Defendants provided evidence that notice of reversal was not received by Green Haven officials until November 20, 1981, and that time was needed "to work out the necessary administrative details." For example, Green Haven officials had to determine the availability of a cell for plaintiff in the general prison population. Defendants' Supplemental Memo at 14; transcript of deposition of Dean Riley, annexed as Exhibit B to Turbin Aff., ¶ 5. On November 21, the day after receiving notice of reversal, plaintiff was charged with committing several infractions, all relating to his refusal to remain in SHU. On November 21, plaintiff was directed to be confined to his cell pending a Superintendent's proceeding regarding the new infractions.

■ Plaintiff maintains that defendants' failure to release him into the general prison population on November 20 constituted a due process deprivation. As the Court has already concluded that Dell'Orfano's initial segregation was not a violation of his constituional rights, the only question now presented is whether defendants' failure to release plaintiff between the

point of notificiation of the reversal on November 20 and the point of renewed confinement for new infractions violated his due process rights.

Assuming that plaintiff had a liberty interest in being released into the general prison population, the record reflects that the short delay in failing to release Dell'Orfano into the general prison population was for unavoidable administrative reasons inherent in the management of overcrowded prisons. Pursuant to state law, such a temporary confinement is not unconstitutional, but rather falls well within the discretion accorded prison officials in managing a correctional institution. The only requirement of state law is that the inmate be in protective custody for "good cause," and that a hearing be held within 14 days of such confinement if the inmate does not consent to the segregation. Both of these requirements were met in regard to both Dell'Orfano's initial confinement and the subsequent confinement that commenced on November 21, 1981. The delay in returning Dell'Orfano to the general prison community is plainly an administrative confinement. Accordingly, plaintiff's fifth cause of action lacks merit.

## F. State Law Claims.

Plaintiff's sixth, seventh and eighth causes of action assert claims under state law over which plaintiff asks the Court to exercise pendent jurisdiction. Pendent jurisdiction refers to "the power of a federal court, once it acquires jurisdiction over a case and controversy properly before it, to adjudicate other claims sufficiently closely related to the main claim even though there is no independent basis for subject matter jurisdiction over the related claims." *Baylis v. Marriott Corp.*, 843 F.2d 658, 663 (2d Cir.1988). But "[w]hen all bases for federal jurisdiction have been eliminated from a case so that only the pendent state claims remain, the federal court should ordinarily dismiss the state claims." *Id.* at 665 (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Accordingly, the Court finds it appropriate to dismiss the pendent state law claims as well.

## CONCLUSION

The Court orders that defendants' motion for summary judgment is granted and plaintiff's cross motion for summary judgment is denied. Accordingly, the Court orders that plaintiff's complaint be dismissed.

SO ORDERED.